Good morning, everyone. Welcome to the Illinois Appellate Court, 1st District, 1st Division. We're going to ask that the lawyers who are going to argue please step up, state your names, and tell us who you represent. Your Honor, it's Chris Gerke on behalf of the State Appellate Defender for Charles Cowart. Good morning, Your Honors. My name is Myles Kelleher on behalf of the people. I'll be arguing issues 1 and 3. Good morning, Your Honors. I'm Assistant State Attorney John Nowak. I'm here to argue the armed official criminal issue, if that is raised. All right. Counsel, you're not on the brief, so let's get the spelling of your name, please. Yes, Your Honor. John, J-O-H-N, last name Nowak, N-O-W-A-K. All right. And we'll depend on the two of you to split up your time as needed, all right? Under Illinois Supreme Court Rule 352B, each side has 20 minutes for the main argument, and the appellant has 10 minutes for rebuttal. We may change that if we have a lot of questions or if the argument becomes repetitive. Please remember to speak loudly. Our microphones really don't amplify well. They're merely to record what's being said. Please also understand we have read the briefs and are familiar with the facts of the case, as complicated as they are in this situation, so please devote your time to your strongest arguments. Mr. Kierke. Good morning, Your Honors. May it please the Court. As I said, my name is Chris Kierke, and I'm here on behalf of Charles Cowart for the State Appellate Defender's Office. Your Honors, we raised three issues in our brief, but I'd like to focus primarily on the first issue that pertained to Cowart's accountability. I'd be happy, of course, to discuss any other issues this Court wishes to discuss. I'd also like to reserve about five minutes for rebuttal, if that's possible. Thank you. Your Honors, the issue in this case is whether Charles Cowart is accountable for the actions of the still-unknown person who shot and killed his friend, Floyd. Floyd was shot in an outdoor party attended by hundreds of people during a massive fight, and seven or more guns fired 28 or more gunshots. Mr. Kierke, does the accountability statute require the person on whose action the accountability charge is based to be, quote, known? It does not require the person to be known, Your Honor. But in Illinois, accountability for unknown... You spend a lot of time arguing that the actual gun person is unknown. Why is that important? Oh, it's important because to prove accountability, you have to prove that the defendant is responsible for the offense. You have to prove that he's responsible to the person that caused the offense, even if that person's unknown. If the person's unknown, however, Your Honors, Illinois has essentially found accountability in unknown principal cases in basically two situations. The first is when you can infer from the actions of the unknown person that they share the same criminal design as the rivals, and an unknown arm was seen shooting at the same person that a friend of his had. Let me ask you something. Could circumstantial evidence be used to establish the sharing of the same common design in accountability cases? Circumstantial evidence certainly can, Your Honor. In this case, your client, Mr. Cowart, went to a party armed with a handgun, and there was evidence that a lot of people at the party were carrying handguns. That's not a normal accessory that a person would wear to a party. So could there be some inference that there is, that he and whoever fired the shot shared some common purpose? I mean, they both went to the party carrying handguns. I mean, who carries a handgun to a party? Visibly tucked into his waistband, I might add. Your Honors, it appears from the facts that not just the unknown shooter and my client were carrying handguns. According to the state's witness's testimony, at this party of hundreds of people, most of the males had guns, almost all of whom were unidentified. That would have been a good party to avoid, wouldn't it? For me, yes, Your Honor. At trial, Your Honors, the state chose to pursue first-degree murder charges against my client under an extremely narrow and difficult theory to prove, that being accountability through the transferred intent of an unknown person. The state's theory is that Cowart and the unknown shooter were part of a common design to harm Aisha Parker and her friends, and that the unknown shooter accidentally shot Floyd in furtherance of that goal. However, Your Honors, the evidence simply doesn't show that, either directly or circumstantially. Do you agree that there's at least circumstantial evidence that your client did fire at Aisha Parker and Elena Williams? Your Honors, even if my client did fire at Aisha Parker, that would not prove his accountability for murder. Aisha Parker did testify that she saw him shooting at her. However, even if he did, there's still no connecting facts proving that the actual person who shot and killed Lee Floyd did so in furtherance of that goal to shoot at someone else. Counsel, let me ask you, the number of spent casings that were found at the scene, all total, how many was it, in the 20s? Yes, 28. And of those spent casings, three were from a 9mm that matched up to the gun that he was found with, correct? Yes, my client was found with a firearm five days after the offense. Do we know where those casings were found at the scene? Yes, they were found in the southeast corner of Keeler and Van Buren. And is that where this fight broke out between the young woman and the defendant? Yes, in that general area, near that corner, yes. Okay, was there specific testimony as to where those were found in the record, specific testimony? Where the cartridges were found? Right. Yeah, I believe in the record when they presented the evidence that they were found in the grass up off the curb on the southeast corner. Okay. And were those casings found near where the area where the victim was killed or toward where the woman was running from the defendant? Well, it's impossible to tell just from where a cartridge casing is, Your Honor, what direction it was fired in. But the location of the spent casing is what I'm saying. In relation to where the victim was killed? Your Honor, we don't know where the victim was killed. We don't know when the victim was killed during the shooting, when this shooting occurred. Was there evidence that the body was moved? Well, my client gave a statement indicating that after his friend, gave a statement to the police indicating that after his friend had been shot that he went and sat on the corner of Congress and Keeler. And I believe at that corner there may have been some blood there, although there was no evidence that it was his blood. I believe one police officer might have testified based on, I think he said based on witnesses who he didn't identify that he may have been shot at the southwest corner of Congress and Keeler. But there's no, but the state doesn't provide any evidence. In fact, no state's witnesses testified even seeing the victim get shot at all. We just simply, there's simply a dearth of facts here connecting the unknown shooter to my client and my client's alleged design to harm this woman. Counsel, could there be someone who was sitting up in a second floor building that actually fired the shot that killed this guy? Sure. As I was saying, Your Honors, no state's witness even saw when Carroll was shot. No state's witness saw anyone even shooting his direction. It's unclear exactly when or where he was shot during this gunfire. The state admitted at trial that the Floyd shooter was unknown. As I said, this shooting, 20 gunshots were fired at a massive party of hundreds of people where a huge fight broke out. Both state and defense witnesses testified that everyone just got fighting. The crowd started going crazy. Everybody was swinging. There was action everywhere. And as I said, state's witnesses testified that most of the males at that party were carrying guns. Now, apart from the one gun recovered from Charles Coward, the physical evidence, as I was saying, showed that at least 25 other gunshots were fired by as many as five or six other guns. All of those guns are unaccounted for. No evidence links any of those guns to anybody in particular. It's unknown what direction those guns were fired in. And none of those guns was even shown to be the murder weapon. Floyd was shot through and through. And so the medical examiner was unable to testify even what caliber bullet. So it's possible that none of those guns were the guns that killed Floyd. Mr. Gerke, in the defendant's videotape statement, did he have an opinion as to who he thought shot the victim? Yes. Didn't he? Go ahead. Okay. In the defendant's videotape statement, he testified that somebody had punched his friend. I think his name was Smooth or Suavo was his name. Well, the names in this case are very interesting. Yes. Notwithstanding the name, didn't he specifically say that one of his homies, he thought Kivo had accidentally shot the victim? Yes, Your Honor. He said that after one of their friends was punched by a man, some of these men were trying to – there were men standing in a circle trying to grab the gentleman. And Kivo said, I'm going to shoot this guy or something and pulled out a gun and fired at him, after which he said that he saw the victim go down. Okay. Now, why wouldn't this be circumstantial evidence? They all had surrounded this person who is referred to in the facts as the baby daddy. They'd all surrounded – let's call him baby daddy for purposes of this hypothetical. And they were surrounding him to do – they weren't surrounding him to congratulate him. Obviously, they were surrounding him for something, and it was not something good. And it was during this, according to defendant's statement, that Kivo, his homie, accidentally shot the victim, not that that's who he was shooting at. Why wouldn't that be – why wouldn't that satisfy the – be sufficient to sustain his conviction under an accountability theory? He was all part of this group that had surrounded this person trying to either shoot him, beat him up, or something. Well, first of all, Your Honors, we don't know exactly – we can only speculate as to why they grabbed him. Maybe they just wanted to grab him because he had just punched one of their friends. I don't think it matters. They didn't want him to punch anyone else. I don't think it matters why they grabbed him. I mean, the fact that they had surrounded him and were closing in on him in a threatening way, and then a shot rang out, why wouldn't that be circumstantial evidence? Well, it's not circumstantial evidence, Your Honor, because there's no indication that Cowart was part of the group that was trying to grab these people. He testified as to what he saw. He never – I mean, so he gave a statement indicating what he saw. He never indicated that he tried to grab this person, that he was part of that group that was trying to grab this person. In addition, Your Honors, the context in which he made that statement was exculpatory under the state's theory of the case. The state actually argued at trial that that is not what happened. They argued at trial that what really happened was that my client was firing at Aisha Parker and that the unknown shooter must have also been firing at Aisha Parker and accidentally struck Floyd. So that's not what the state's theory of the case was. And in the context of my client's statement is actually exculpatory. His statement, if believed, he did not fire a gun. He possessed but did not fire a gun. And the gun that was found on him was a different gun, according to him, that was found five days later. And he also did identify three persons as firing at those girls. However, he testified that this occurred – or he gave a statement indicating that this occurred only after Floyd had already been shot. So if Floyd had already been shot, even if you disbelieve that my client fired a gun and believe that he fired with these girls at Aisha Parker and his friends, he can't be responsible for Floyd's death because it already happened. And that statement came in – he didn't testify. My client did not testify, no. So that statement came in. And you can refer – make reasonable inferences from whatever was in that statement. Is that pretty much true? The jury, when they're coming to the conclusion, they can make reasonable inferences, right? Absolutely. For many of them. You can make reasonable inferences, Your Honor, but that's not to say that you can speculate based on what the facts are. Well, that's what I'm saying. So any number of reasonable inferences could be drawn from his statement, could they not? Sure, yes, Your Honor. So it would be reasonable to – well, never mind, continue. Let me ask you about the statement, though. Sure. Again, how did that get in? It was presented by video. Okay. But under what – why is it in here, say, or how did it get in? Was it objected to? I believe – I don't believe it was objected to. I believe it was a statement against his party opponent. Okay. Thank you. There's one fact I'd like to emphasize, Your Honors – or two, rather. In addition to the 25 gunshots that were fired by as many as five or six guns, none of which are accounted for, both in my brief and in the State's brief, we agree that even more guns could have been fired by even more unknown persons. Expert testimony indicated that if revolvers were fired, they wouldn't have left cartridge casings. So there's a possibility of even more unknown shooters who are firing for unknown reasons. In addition, Your Honors, the physical – at least the physical evidence reveals that some cartridge casings simply could not have been fired at Parker as she ran south towards the highway along the east side of the school. There are cartridge casings on the north side of the school, significantly west of Keeler on Van Buren, which could not have been fired around the corner at Parker when she said she was being shot at. Now, the key here, Your Honors, is that the State failed to provide connecting facts proving beyond a reasonable doubt that the unknown person who actually shot and killed Lee Floyd did so in furtherance of my client's alleged design to harm Aisha Parker. But I'd also like to point out that the State's evidence is ambiguous, even regarding whether my client even fired at Aisha Parker. She did testify that she saw him firing at her, and one other witness testified that he saw my client firing a gun. But the physical evidence contradicts or at least undermines the only – those are the only two witnesses who testified that my client fired a gun at all. The physical evidence shows that there are multiple cartridge casings at the precise location – at or near the precise locations where they testified they saw my client firing. But those match three different guns, none of which was the gun that my client possessed five days after the shooting. In addition, Your Honors, I'd like to point out that the timing of when Floyd was shot, even if my client fired a gun, the timing of when Floyd was shot is completely unclear. If Floyd had been shot before my client participated in this offense to allegedly harm Aisha Parker, he could not be found accountable for this offense. Both Parker and Johnson, who are State's witnesses, indicated that Cowart did not fire the first shot. Johnson said that Pooh Bear fired the first shots, and that Parker testified that she did not see Cowart firing when the first shots were fired, that Cowart was in the midst of the physical fight that took place when the shots were fired. And that's – by the way, that's corroborated by defense witnesses saying he was in the middle of a physical fight when the first shots were fired. Didn't the State witnesses say that, that he was involved in a fight on the ground when shots were fired? A defense witness specifically said that he was on the ground, but Aisha Parker herself, who testified that she was shot, she said that he was in the midst of the fight when the shots went off. In addition, as Parker testified, that she first saw Cowart fire at her six or seven minutes after the first shots had been fired, and after multiple other gunshots had been fired. If Floyd had been dead before that, even if my client fired at her at that point, he could not be accountable for Floyd's murder. The key here is that the State's trying to show that my client's action of firing at Aisha Parker made him accountable for the death of his friend. Where we don't know who the shooter is, and in these very complicated circumstances where there's hundreds of people at a party, and hundreds of potentially other armed people at this party, given the number of unaccounted for guns and gunshots in this case, in addition to the fact there's hundreds of potentially other unidentified shooters, there's simply no way the State's evidence was sufficient to link the unknown principal in this case to my client's alleged criminal design, if he even had one. Now, if there are no further questions, Your Honors, I deserve the remainder of my time for rebuttal. Counsel, as far as accountability, you have to show intent. That's one way to show it, or a common design. Is that right? Yeah, you can show a shared intent, which you can't show in this case if you don't know who the shooter is, but you can also show a common design. Finish your sentence, and I'll throw my question. You can go ahead. I was about to. Why doesn't the omissions in his statement demonstrate the common design? Which omissions, Your Honors? Just in general. It's 50 pages long. Okay. But you read the whole thing. Well, in his statement, which, again, the State argued at trial should not be believed, or at least not all of it, the factual scenario of how it was shot should not be believed. The statement's actually exculpatory. As I said, if you believe his statement, he never fired a gun. And even if you don't believe that he fired a gun, even if you do believe he fired a gun, his statement indicated that he identified just three persons that fired at these women after Floyd had already been shot. In addition, Your Honors, we still have five or six unaccounted for guns and gunshots, and he only identified three people. And there's no indication that even one of those guns is somehow linked to these three people. The facts here are just too amorphous and ambiguous to sort of draw a sufficient connection to uphold a murder conviction in this case. Do we know if anyone else was shot during the melee? Nothing in the record, I think, indicates that anyone else was shot, no. Well, let's assume for a moment someone else was shot. Okay. Could the same charge be brought against this gentleman? For that person who was nearby and in the group, if there was still an unknown shooter and they were hurt and not killed? Where does accountability stop? That's kind of the question here, Your Honor. I think finding a murder conviction in this case would greatly broaden accountability. Accountability is not just sort of if people are committing crimes in the vicinity of one another, they must all be working together. You actually have to show a common design. The point of accountability is to establish criminal responsibility for the actions of someone who has committed a crime. And to establish that criminal accountability, you have to show intent. You have to show a common design. So if someone else was shot, I think, I mean, we probably need more facts, Your Honor, as to who was shot and where they were standing. But I would argue that the same is true. And without knowing, you know, who was shooting at them or what direction they were in or, you know, who the shooter was, especially in this case, especially under the unique facts of this case where there's just this chaotic scene where 28 gunshots were fired, I don't think you could definitively establish beyond a reasonable doubt that my client or anyone else, for that matter, would be responsible for that offense. Counsel, do you think the State appropriately distinguishes the Perez case that you cite? Or do they? You know, Your Honor, I'm not sure. I think Perez was a case from what I recall as a case where there was no accountability where the defendant and his fellow gang member, but he didn't know, but his friend was shot or something like that. And, you know, you couldn't establish accountability. I don't believe I analogize to that case or anything. Well, you do have it, yeah. Yeah, I know it's incited in my brief, Your Honor, but mostly for the idea of distinguishing shared intent from a common design. I think even the State agrees that this is not a shared intent case because you can't prove the intent of an unknown person. They found in that case there was no common design. They did not. They did, right. There was no common design. All right. Thank you. Are there any further questions? No, thank you. Thank you. All right. May it please the Court. My name is Miles Kelleher on behalf of the people. Under well-settled principles of accountability, the evidence was more than sufficient to support defendant's conviction for first-degree murder. Defendant was engaged in a common criminal design with his friends to attack these two young women, Aisha Parker and Elena Ray. Mr. Kelleher, before you go much further, your opponent made a statement which I think is very interesting. I'd like your response. He said, in response to a question from Justice Connors, if people are committing crimes in the vicinity of one another, they're not necessarily accountable for each other's crimes. You still have to show a common design, since we agree that this isn't a shared intent case. Can you respond to that? I think that's very important. Yes, Your Honor. Of course, our burden is to show that there is a common criminal design. But once we establish that the defendant is part of this common criminal design, then each member of that criminal design is responsible for the acts of the others that commit offenses in furtherance of that criminal design. What is the common design here? In response to the specific question that I asked, you know, in analyzing what your opponent just said, I think that's important. That kind of goes to the crux of your case. So I would like your best response. The common criminal design here was to retaliate for a statement that Elena Riley had made. We don't know the content of that statement, but based on the surrounding circumstances and reasonable inferences, we can infer that it was very offensive to the defendant and his group of friends. So much so that one of the defendant's friends, Smooth, throws a drink into Elena's face, and then the defendant slaps her. And that sets off a series of events. So the common criminal design is to attack these two women, and also one of the woman's friends, who was the father of her child, referred to as the baby daddy by defendant. He was part of the group that was being attacked by defendant and his friends. So the common criminal design began after this comment was made, and it escalated into a physical fight, and then escalated into a gunfight, where defendant... But tying back to the gunshot, and Justice Connors asked the question, which I think was very interesting and important, do we know whether some other, some yet unknown party who was, of a person who was sitting in a second floor window fired the gun? I mean, there were so many shell casings all over. Who knew who fired those? Simply because they were all in the same area. Does the common design that you're describing come from the physical altercation, and does that carry over to the gunshot? Well, first of all, the jury wasn't required to search out all possible explanations. I know, but I'm asking you a specific question as related to my hypothetical. So could you answer that? Well, we can infer from the surrounding circumstances, as well as defendant's statement, that the gunshot was fired from either defendant or one of defendant's friends. How can you infer that? Because defendant, in his statement, he talks about being with his friends, he calls them his buddies or homies. He mentions the names of everyone there, Bird, Smooth, the victim, Lee Floyd, Kivo, Hubert, Peewee. But there were 200 people at that party, and there's a lot of evidence in the record to suggest that most of those males at the party were armed. They weren't all defendant's friends, were they? It's unlikely that they weren't. But defendant does know the people who were involved. Were involved in what? The retaliation against these two young women and the baby daddy. In the statement, defendant... Mr. Keller, I'm trying to get you the answer specifically. How do we know where the shot was fired from? I mean, there were 200 people at the party, and there may even have been more. And most of the men who were there were armed, and not all the men were defendant's friends. Would he be accountable for a common design of some of the other faction who weren't his friends if they fired the gun? Would he still be held on accountability theory if it was fired by a member of the other faction, whatever that may be? Well, here we have a situation where defendant, he's talking about the baby daddy, and he says, all people that we know are trying to get the guy. Defendant says, they're in a circle. And it's important when he says, all people that we know. That means defendant knows these people. These aren't strangers. So these aren't people who might be a block away. Defendant, in his own words, says he knows these people. Counselor, doesn't he always say in his statement that he didn't fire a gun? Doesn't he say that in his statement? Right. Yeah. And there was evidence that he did fire a gun, right? Yes. So what do we believe of his statement, which was not subject to cross-examination? I think his statement shows that he didn't understand the laws of accountability. Well. Because he admits that he's there armed with a gun. That's correct. He admits that he's there armed with a gun. He doesn't admit to firing it. Rose Caesar, Ivy, sees him shooting the gun with his arm extended, not pointing up in the air, but firing at someone. And also Aisha Parker sees him firing a gun. And then he's caught four days later with a gun, a 9mm Smith & Wesson. Right. But my point is, use his statement against him for this one issue. I mean, it's like picking and choosing things out of a statement just willy-nilly. It's going to help your case. I mean, we say we're going to rely on this part of the statement, because he said he saw a pool of beer. Well, is that how we determine accountability? Well, it was up to the trier of fact, the jury, to decide, you know, whether to believe all of the statements, some of the statement, or none of the statement. And when you look at the statement, and combined with the other evidence, especially Ivy's testimony, and Parker's testimony, even Peggy Ellen, who saw a person running down the street, firing at two women, this is all consistent. But didn't the case witness say that he was on the ground, he, the defendant, when the first shots rang out? Well, Ivy's testimony was that he didn't hear any shots before he saw the defendant fire the gun. So, from Ivy's testimony, it could be inferred that the defendant may have fired the first shot. Oh, but I know, Counselor, there was at least one state's witness. Right. Aisha Parker, right, she didn't see defendant firing a gun. until she's being chased. She's running south down Keeler. So, that doesn't mean defendant didn't fire a gun sooner, it's just that, according to Aisha's testimony, she didn't see him before that. When was Mr. Floyd shot? It appears that Floyd was shot right in the intersection of Van Buren and Keeler. At what time? There was blood found nearby. What time? When did this happen? No one knows the exact time. However, almost all the shell casings were found very close to the intersection of Keeler and Van Buren. There were a few shell casings found just a little south and a little west, but very close, very close, all within, very close to the intersection. So, it appears that he was shot very close to when the first shots were fired. Now, the, your opponent tries to get a lot of mileage out of an argument we haven't talked about yet, which is that you're relying, you're building your accountability structure partially out of shots that were fired after the victim was already on the ground and basically dead. All right? And they argue that, well, the crime is complete at that point, so anything that happened afterwards can't be used to build up the accountability structure. And you come back and say, well, accountability depends on acts that are, that happen either before or during the crime. But as I'm looking at the case law, it seems to say before and during. It doesn't say after. So I'm wondering if you could address that. Your Honor, this was all a continuing offense. And the, when the case law talks about the commission of the offense, it doesn't just say when the first shot was fired. Here, the offense began when the defendant physically slapped Aisha Parker, and that escalated. And it didn't end. So you're relying on the slap? No, I'm just saying that's when it began. And the offense continued all the way until Aisha and Elena were able to flee the scene, get across the bridge. So now, whether the defendant fired the first shot, second shot, third shot, it really doesn't matter. As long as he was firing shots during the commission of the offense, he is still responsible for any of those shots that were fired. That's why I asked where the shell casings were from the 9mm, if that was a gun that was used even. But where were they in relation to Ms. Parker versus Mr. Floyd? The shell casings from the 9mm that was recovered when the defendant was shot were found on the east side of Keeler, just south of Van Buren. And was it toward the way she was running? It was slightly south of the intersection. Again, I want to know, was it seemingly directed at her the way she was running, away from the scene? The evidence indicates that the shell casings were found there. It doesn't indicate which way the gun was pointed. I understand that, but I just want to know generally, were they in the direction of the way she was fleeing? One could reasonably infer yes, because if the defendant is at the intersection of Van Buren and Keeler, and the two women are running south, the shell casings would be entirely consistent with firing southbound. At the girls? Yes. Right. Right. So the location of the shell casings supports a reasonable inference that the defendant was firing the gun at these girls, just as the testimony, Ayesha's testimony, indicates that he was. What evidence is there that he was responsible or conspired, had a design with someone to shoot Mr. Floyd? That's what I'm trying to figure out. So everything that happens in that melee, you can charge this man with accountability for? Yes. It appears that Mr. Floyd was shot accidentally because he was. We don't know. Could someone have had a grudge against Mr. Floyd and just used it, wow, here's a good time to shoot him? I don't know. Do we have any idea? Well, that's, you know, the jury didn't have to search out every possible explanation. However, the evidence. Beyond a reasonable doubt, beyond a reasonable doubt, that he was accountable for this murder. Even defendant, in his statement, he's saying Kibo shot Floyd accidentally. So even defendant believes that it was one of his friends that fired the fatal shot. Kelly, you don't really know what defendant believes, because basically you disregard some of his statements, as Justice Connors pointed out. So who knows? Maybe he was just trying to deflect attention from himself, or as you pointed out, he doesn't understand the law of accountability. And as I point out, many lawyers don't either. Perhaps he was just trying to help himself in some way. How does that support your theory? I don't think you responded, at least not satisfactorily to me, to the question that I asked you regarding your opponent's statement. If people are committing crimes in the vicinity of one another, and they're not necessarily working together, are they accountable for each other's crimes? Don't you still have to show a common design? And you explained that the common design was shooting at Aisha. But how does that link to the shot that killed Mr. Floyd? Because it could have been fired, as Justice Connors said. What if there was somebody else who seems like these people all had grudges against each other, and it was a big, chaotic mishmash? What if one of Mr. Floyd's enemies happened to be in the mishmash and thought, well, this is a good time to shoot him, nobody will notice? I mean, would that be assumed for the moment that that's true? And we don't know. It could very well be. Would the defendant be accountable for that? This would be a factual question for the jury to decide. No, but I'm asking you. That's one of the things. I get to ask you a question, and you have to answer it. And that question I'm asking you as a hypothetical could very well be an inference that could be drawn from the facts of this case. And my question is, what if Mr. Floyd was shot by somebody else in that melee that had nothing to do with Defendant and his homies, just somebody else who wanted to get Floyd? Would Defendant be accountable for that under that theory? Under the circumstances of this case, I would say yes, because Defendant's still at the scene armed with a gun, firing the gun in the direction of other people. However, here the standard of review is when the evidence is viewed in the light most favorable to the prosecution. And here a rational trier of fact certainly could have found that it wasn't some unknown person who fired this shot. How would you establish the common design element in the hypothetical I just gave you? If the shot was fired by an enemy of Floyd who decided that they would use this opportunity, how would you link up the dots? What would the common design element be in that scenario? Well, Defendant being actively involved in the commission of the offense still has the intent to promote and facilitate the offense. Promote and facilitate what offense? The killing of Floyd? If it was done by one of Floyd's enemies that wasn't one of Defendant's homies? Well, when you're shooting a gun, there's a number of unforeseen consequences that can occur, especially when your friends are shooting guns, too. And if the law was to simply say, well, there's always a hypothetical sniper two blocks away who could have shot, you know, that would allow numerous defendants to avoid punishment. I think we have to agree that the facts of this case are a little unusual. There were so many people. Most of them were armed to the teeth with guns. Everybody was fighting everybody else. This is not the usual kind of case where you see an accountability theory applied. And, you know, I think if it were, I'd agree with you, but the facts here are a little unusual. But even though there were a lot of people in the area, this incident actually was kind of confined to a very small geographical area. Is there any evidence in the record about how close the victim was to the defendant at any given point in time? In defendants' own words, he says they're all in a circle trying to get the baby daddy. And he says, you know, these are all people that we know trying to get this guy. So the defendant even knows which one has guns. He even knows which one fired the gun. Mr. Kelleher, the State's time is up, and I know we had a lot of questions, so I'm going to let you give us your last thought, and then we'll let Mr. Nowak take about five minutes for the Aguilar issue, all right? Okay. Just in summary, when the jury had the opportunity to look at the direct evidence, the circumstantial evidence, and based on all of that in the light most favorable to the prosecution, a rational jury could have made reasonable inferences from the evidence and found that the defendant was engaged in a common criminal design with his friends to retaliate and that the fatal bullet was fired as part of this common criminal design. As such, the defendant is responsible for the acts of his members of the common criminal design. For all of those reasons, as well as those in our brief, I would ask that this honorable court affirm defendant's conviction for first-degree murder. Thank you. Thank you. Mr. Nowak, what's the status in the Supreme Court of this issue? Yes, Your Honor. The State, we filed our brief on October 8th, and Defendant McFadden filed his brief in response and also cross-appealing in December. He cross-appealed on an excessive sentence issue. Our brief in reply and also in response to the cross-appeal is due January 21st, a week from today. So we're probably not going to have arguments until? March. You think it's going to be March? Yes. Typically, the way the court typically does it would be that as long as the brief's filed by, say, mid-February, then it will be set for alarm at that point. I'm happy to make an argument on this point, Your Honors, or if there's any other questions you have on it. Well, let me ask you my question because this will lead us along the path. But, you know, this is certainly after all the recent jurisprudence from higher courts on the Second Amendment. We know that there's going to be a domino effect and it's going to be unexpected issues relating to those cases. This is certainly one of them. But hasn't at least this district spoken on the issue a few times and always in the same direction, saying that if the prior crime is now void of an issue and, therefore, cannot be used as an aggravating factor as an element of a second crime? That is something that this court has uniformly held since McFadden and Fields, Your Honors. But, again, as this court's well aware, the Illinois Supreme Court has taken our appeal in McFadden and is holding the myriad of other decisions that we've filed petitions for legal appeal on in advance. They're holding them. And has there been any downstate district that has ruled to the contrary? I don't believe there's any downstate district that's ruled one way or the other. Actually, I believe that this court's jurisprudence on it is that. So this court and this particular division's view on this is established in a Rule 23 that I understand but won't discuss. So our argument for the Illinois Supreme Court is expanding on the argument before this court, but it's along the same lines. That this defendant had a valid AUW conviction at the time he possessed that gun in June and he would have had to have it vacated before he possessed the gun on that date and that anything that happens after he possesses that gun is broken. And the argument that you make, and I think I read another brief from your office that's on another case coming up, where somebody cited the cases of 47 other states and three foreign countries or something. Yes, that's going along towards our most recent version of this argument for the Illinois Supreme Court. Yes, sir. But, you know, I'm having a hard time getting, you know, being convinced that we were wrong on the other cases because, you know, your argument has some legs if it was a civil issue. But in criminal law, we've got different rules. And that's what I'm having a hard time getting my hands around. Because you're trying to say, well, at the time he committed this crime in this case, he had this prior. And it was, you know, this big, you know, letter A on his forehead, like in the scarlet letter, and therefore it can, you know, what happened at that time can never ever be taken away. But if that crime, that scarlet letter, has since been declared unconstitutional. Again, Your Honors, it all depends on what that status was on the particular day he possessed that weapon. And in this particular case, in the briefs here, we cite a few cases. And one of those is the Lee case from the Seventh Circuit. And in that case, the defendant had his prior gun conviction expunged ab initio to a date before he committed the felon and possession offense. So it was as if he had never been convicted of it. The Seventh Circuit said that's irrelevant. The fact that you had to actually get into court and have that prior felony conviction expunged before you possessed the weapon. And here's another way to look at it, Your Honors, is that the day after Aguilar was decided, the Illinois Department of Corrections did not suddenly open up the doors and let every single defendant that was in prison on a class 4 AUW out. Of course they didn't. Of course. Right, because exactly. There is a procedure that has to be followed. And that is each defendant needs to go into court to have that particular conviction vacated before he can possess a gun or before he gets out of prison. And that's why it matters. And you're saying if we follow the Seventh Circuit, even if they do that and get it expunged, it doesn't matter? It doesn't matter. He would have had to have it expunged before that day he possessed the weapon in June 2009. For those reasons and those in our briefs, Your Honors, we ask that you affirm the arbitration. Thank you. Thank you. Defense? I'll be brief, Your Honors. My opposing counsel, when he was up here. Mr. Kierkegaard? Yes. I'd like you to, you know, the statement that you made before that I'm so stuck on, because I asked about it three times. Could you expand on that a little more? You know, I wrote down exactly what you said, and I think it's very important on that issue because of the question of the chaotic nature of what was going on and the fact that all of those, so many of those people were armed with guns, nobody could tell who was shooting at whom. And I think Justice Conner's hypothetical question is a good one. Is there, how do we know there wasn't somebody who had a grudge against the decedent that decided this was a good opportunity? Since he had his gun and the guy was there, just shoot him. Would that be a part of the, how would you show a common design under that circumstance? I asked your opponent, and he didn't really give me an answer. So is your question how you prove a common design? This is still a common design case, because I think the State agreed that there's no shared intent, this is not a shared intent case. So what would the common design be? I mean, I'd be asking you to answer your, this is an issue that your opponent should answer, but your answer could be there is none or something like that. But I'm asking you because I think that's an important point. I don't think there's any evidence of a common design between the unknown shooter in this case and my client. What the State had to show, because the only thing we know is that, about the unknown shooter, is that he or she shot Floyd. The only way to prove a common design would have been to show that they did so in furtherance of my clients, some other criminal design that he had, in this case, shooting at Aisha Parker. So even if my client shot at Aisha Parker, which opposing counsel kept providing fact after fact, trying to argue that that's what the evidence showed, it doesn't matter. Because they have to show that that common design, that the act of shooting at Aisha Parker, is what actually resulted in Floyd's death. And there's no connecting facts here showing that. And again, I think the statement I made before is that the accountability statute does not encompass people committing crimes in the vicinity of each other. There has to be an intent there. And even in Fagan, Your Honor, the Seventh Circuit case, it indicates the accountability statute only encompasses deliberate assistance with the crime. The Perez case, the owner of the Supreme Court, says no guilt attaches unless the accomplice intends to aid in the commission of the crime. Even if that results in a different unintended crime, they still have to act intending to commit the principal's crime. And, for example, I'll give Your Honors another example. There was in Peterson, which is a First District case, two defendants were shooting at each other. There's no question that who the identities of those persons were. But they were not accountable for the death of the person that one or the other shot because they were acting at cross purposes. It was clear that they did not share a design. And here we don't have facts of a common design. Now, if there are no further questions about this or about the other issue that Your Honors discussed, I would like to submit this case for review. All right. Thank you, Mr. Gurkein. Thank you, Counsel. The Court will take the matter under advisement. And the Court stands in recess.